**John BROWN, Plaintiff,**

v.

**BKW DRYWALL SUPPLY, INC., Defendant.**

**No. 2:02–cv–202.**

United States District Court, S.D. Ohio, Eastern Division.

Feb. 20, 2004.

2000 WL 799314, *2 (6th Cir.2000).

Tony C. Merry, Palmer Volkema & Thomas—2, Columbus, OH, for Plaintiff.

Joseph Scott Streb, Columbus, OH, for Defendant.

---

1. Defendant points out that Brown was hired by Joe Korpieski, a personal friend of his.

## OPINION AND ORDER

MARBLEY, District Judge.

### I. INTRODUCTION

In this employment discrimination case, Plaintiff, John Brown, alleges that Defendant, BKW Drywall Supply, Inc. ("BKW"), terminated his employment in violation of (1) the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq. ("ADA"); (2) the Ohio Civil Rights Act, Chapter 4112 of the Ohio Revised Code ("Chapter 4112"); (3) the Family and Medical Leave Act, 29 U.S.C. § 2617 ("FMLA"); and (4) Ohio public policy as expressed in the ADA and Chapter 4112. This matter is before the Court on Defendant's Motion for Summary Judgment and on Plaintiff's Motion to Strike the Affidavit of Brad Ballantine. For the following reasons, the Court **GRANTS** the Motion for Summary Judgment and **DENIES** the Motion to Strike.

### II. FACTS

BKW hired John Brown as a drywall stocker and driver on October 12, 1998.[1] His job entailed loading drywall products onto delivery trucks, driving to delivery sites, unloading the materials with a crane attached to the truck, and carting the material to various areas around the job site. On February 28, 2000, Brown was elevated to the position of dispatcher. Brown states that he requested and received a transfer to the dispatcher position because of his disability, loin pain hematuria syndrome ("LPHS"). Specifically, severe back pain and swelling in his feet made standing and walking difficult. Brown was awarded the dispatcher position by his friend and supervisor, then the on-site

Both Brown and Korpieski built and raced motor vehicles.

general manager of BKW, Joe Korpieski.[2] The dispatcher position involved coordinating orders for drywall products, helping drivers set up their loads, and ensuring the trucks got to the proper locations at the proper times.[3]

In mid–2000, Korpieski was terminated for theft. Korpieski had been purchasing parts for his personal drag racer on BKW's account at Napa Auto Parts. According to Tracy Hein, who generally oversaw operations at BKW at the time, Brown was involved to some degree in Korpieski's theft, but not to the extent that he was ever accused of or discharged for theft.

In August 2000, Scott Coppens was hired as the new on-site general manager. In September 2000, Brown missed a day of work due to an LPHS-related kidney biopsy. In November 2000, Brown was off work on approved medical leave for two-and-a-half weeks due to LPHS. According to Brown, he needed the leave "because my feet had swelled up so bad, I couldn't hardly walk." When he returned to work in November 2000, Brown had a return to work slip signed by his physician, Dr. W. Fred Miser, and dated November 20, 2000. This form allowed Brown to return to work without any restrictions.

When Brown returned from medical leave, Coppens asked him to quit and apply for long-term disability benefits.[4] Brown refused: "I advised him I couldn't afford to. I said I could do my job." On January 4, 2001, Brown's employment was terminated, allegedly due to poor job performance. Approximately one week after the termination of his employment at BKW, Brown was hired by Hughs Building Supply to perform substantially the same sort of stocker work he initially did for BKW.

Hein, Coppens, and Plaintiff's co-worker/supervisor Larry Parker all testified at deposition as to various problems that they and others had with Plaintiff's job performance. In general, these problems centered on Plaintiff's perceived laziness and bad attitude. For example, Parker testified that Brown was viewed as "an excuse-laden slacker," and Hein testified that she received complaints that Brown "wasn't a team player."

Plaintiff's alleged disability is loin pain hematuria syndrome ("LPHS"), a disease characterized by severe pain in the loin or flank, accompanied by hematuria, defined as blood in the urine. There is some dispute regarding whether LPHS "constitutes a medically accepted clinical condition";[5] however, there is no dispute that

---

2. In explaining why he was given the dispatcher position, Brown testified, "Joe [Korpieski] knew that I was having problems with my health."

3. Defendant notes that at all relevant times, BKW had no formal job titles or written job descriptions. Employees were expected to follow the directives of managers with respect to their job requirements and duties.

4. Brown testified to the conversation as follows:

 A. The first week of December, Scott called me in his office and advised me that he thought I should take more time off and go on my AFLAC due to my medical conditions.

Q. Are you referring to a disability insurance of some kind?

A. Yeah.

Q. Was that provided through the employer?

A. Yeah. We paid for it, though.

5. Dr. William P. Gianakopoulos, an expert retained by Defendant, states his opinion that LPHS is not a medically accepted clinical condition:

 The entity of loin pain, hematuria syndrome has very limited scientific data, as well as minimal objective findings to this clinical collection of symptoms. The difficulty with labeling clinical symptoms as a syndrome is that there is no way to quantify the disease process, if it even exists at all. The patho-

Brown has experienced certain symptoms, regardless of the diagnosis attached to those symptoms. According to Dr. Lee H. Hebert, a physician who treated Brown for a condition diagnosed as LPHS, to qualify for such a diagnosis, the patient must be suffering from "deep pain" in the kidney area. Muscle tenderness "because of muscle spasm is common." Also, "[t]he pain must have been present for 6 months or more and sufficiently severe to prompt their physician to prescribe narcotics." Brown takes high doses of narcotics daily, including 40 mg of Oxycontin twice a day and 5 mg of Oxycodone as needed for "breakthrough pain." He also takes Micardis, Lasix, and Spironolactone daily. Brown testified that these medications make him groggy most of the time. Hebert's medical judgment is that Brown's LPHS "caused him … to be substantially disabled from standing or walking."

In a letter dated November 17, 2000, Hebert, a nephrologist at The Ohio State University, described to Miser, Brown's family physician, Hebert's findings regarding Brown's condition. After discussing a kidney stone passed by Brown and the results of a urinalysis, Hebert states, "[T]he patient's symptoms are dominated by the fact that he has dyspnea on exertion and low back pain."[6] Hebert also states, "With respect to his loin pain hematuria syndrome, those symptoms seem to be under reasonably good control. Most of his pain now appears to be the result of an orthopedic syndrome undoubtedly related to his great weight [362 pounds] and abdominal girth which is putting excessive strain on his lower spine." Hebert concludes with, "[i]n summary, most of Mr.

Brown's problems now appear to be related to his great weight gain and excessive dietary intake, particularly of salt and protein. Thus, central to the successful management will be to bring these conditions under control."

Defendant asserts that Brown never informed BKW of any disability and never requested any reasonable accommodation for a disability. Both Hein and Coppens, the two people directly involved in the decision to terminate Brown's employment, testified that they were unaware of any disability or medical condition that could be considered a disability. Brown points to testimony that he says supports the idea that Coppens was aware of Brown's condition:

Q. Did you have any conversations with John about his health, his medical condition?

A. Yes.

Q. Tell me about that.

A. John was just telling me that he was having some problems, some medical problems. His feet swelled up on occasions and that he had some medical problems, that's basically what it came down to. They were trying to diagnose him at the time, I guess.

Q. Did you ever learn what the diagnosis was?

A. No.

Q. But you did know that he had some medical problems and that they were struggling to find out precisely what?

A. Yes.

logic findings are very non specific, and the objective clinical findings are non existent. The only two sources of information on LPHS before the Court are two scholarly articles, both co-authored by Dr. Lee H. Hebert, who

treated Brown for his condition from July 26, 2000, to November 17, 2000.

6. "Dyspnea" is defined as "labored or difficult breathing." *Dorland's Pocket Medical Dictionary* 224 (23d ed.1982).

Hein testified that she knew that Plaintiff had been off on medical leave, but that she was not aware of any medical condition that Brown had. Brown testified that he gave a copy of a journal article on LPHS to Esther Kessler, BKW's office manager and bookkeeper, to read. Brown states that he talked to Coppens in December 2000 about the swelling of his feet. It is undisputed that BKW did not ever possess any documents addressing Brown's alleged disability, with the possible exception of return to work slips, all of which allowed Brown to return to work without any restrictions.

On April 23, 2001, Brown filed a Charge of Discrimination with both the Equal Employment Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission ("OCRC"). On November 29, 2001, the OCRC issued a no probable cause finding on Brown's Charge. On March 5, 2002, Plaintiff filed a Complaint with this Court, seeking damages for violations of the ADA, Chapter 4112, the FMLA, and Ohio public policy. This matter is now before the Court on Defendant's Motion for Summary Judgment, filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. In addition, Plaintiff, pursuant to Rule 56(e), has filed a Motion to Strike the Affidavit of Brad Ballantine. The Affidavit of Brad Ballantine, chief operating officer ("COO") of BKW, was attached to Defendant's Motion.

### III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1388–89 (6th Cir.1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *accord Moore v. Philip Morris Cos.,* 8 F.3d 335, 340 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (finding summary judgment appropriate when the evidence could not lead a trier of fact to find for the nonmoving party).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations ... but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Searcy v. City of Dayton,* 38 F.3d 282, 286

(6th Cir.1994). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the nonmoving party. *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505; *see Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995); *see also Matsushita,* 475 U.S. at 587–88, 106 S.Ct. 1348 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

■ Affidavits submitted in support of a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit." Fed. R.Civ.P. 56(e); *accord Monks v. Gen. Elec. Co.,* 919 F.2d 1189, 1192 (6th Cir.1990). "An affidavit that does not satisfy the requirements of Rule 56(e) is subject to a motion to strike." *Reddy v. Good Samaritan Hosp. & Health Ctr.,* 137 F.Supp.2d 948, 954 (S.D.Ohio 2000) (noting that the three requirements set forth in Rule 56(e) are mandatory) (quoting *Collazos–Cruz v. United States,* 117 F.3d 1420 (table), 1997 WL 377037, at *2 (6th Cir. July 3, 1997)). While a court must disregard any hearsay statements and statements not based on personal knowledge when ruling on a summary judgment motion, the court should consider any remaining portions of an affidavit that are admissible. *See Vass v. Riester & Thesmacher Co.,* 79 F.Supp.2d 853, 858 (N.D.Ohio 2000) (citing *U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1189 (6th Cir.1997)).

## IV. ANALYSIS

### A. Motion to Strike the Affidavit of Brad Ballantine

■ Defendant relies upon the Affidavit of Brad Ballantine and attached exhibits in arguing its Motion. Ballantine prefaces his Affidavit with the following statement:

> As COO of the corporation, I have reviewed business records relative to the case made at or near the time, by or from information transmitted by, persons with knowledge, kept in the course of regularly conducted business activity, as well as deposition transcripts cited in the foregoing Motion, and thereby I have personal knowledge of all matters mentioned herein. Records attached hereto and referred herein as "business records of BKW" were made at or near the time, by or from information transmitted by, persons with knowledge, kept in the course of regularly conducted business activity of BKW. However, other than the information I have reviewed in my capacity as a corporate officer, I have no independent knowledge of the facts of the case.

In support of his Motion to Strike, Plaintiff argues that since Ballantine does not have personal knowledge of the facts of the case he may not attest to them. Plaintiff also asserts that any statements purporting to express a medical opinion must be struck since Ballantine is not a medical expert. Defendant contends that the level of knowledge represented in Ballantine's Affidavit is permissible where a corporate defendant seeks to present information and documents for review on summary judgment.

■ Defendant is correct that the affidavit it has presented is a permissible means for a corporate defendant to state its position and incorporate documents. Ballantine's Affidavit is nothing more than a restatement of BKW's positions in this lawsuit, based on the depositions and documentary evidence available in this case, as well as a convenient means of putting be-

fore the Court the business records of Defendant. While it is true that many of the factual statements in the Affidavit are admittedly not made based on Ballantine's personal knowledge, Defendant does not rely on any of these factual statements to support its Summary Judgment Motion. In fact, outside of background corporate information, upon which Ballantine is qualified to attest, Defendant never cites to Ballantine's Affidavit in its Memoranda without also citing to the deposition testimony upon which Ballantine bases a given statement. A corporation is entitled to state its legal positions and bring business documents into the summary judgment record via an affidavit of a corporate officer. *Cf. Human Res. Inst. of Norfolk, Inc. v. Blue Cross of Va.*, 484 F.Supp. 520, 525–26 (E.D.Va.1980) (allowing, in antitrust case, affidavits of executive officers that made statements of ultimate fact and conclusions of law without apparent basis in personal knowledge and determining that such statements would merely be viewed as declarations of each affiant's understanding of the corporation's legal positions and as sworn denials of certain of the plaintiff's allegations).

Viewed in this light, Ballantine's statement that Plaintiff's medical condition is "treatable and temporary" obviously is not competent medical evidence of that fact; rather, it is properly viewed as a statement of BKW's legal position that the reason Plaintiff's condition is not a disability under the ADA is that it is "treatable and temporary." Any other statements in the Affidavit purporting to state the cause or impact of Plaintiff's condition are clearly made with reference to the letter from Hebert to Miser and represent BKW's le-

gal position as to the facts contained in that letter.

For the foregoing reasons, Plaintiff's Motion to Strike is **DENIED.**

### B. Plaintiff's Disability Discrimination Claims

Plaintiff claims that Defendant terminated his employment because of his disability, in violation of both federal and state law. The ADA reads, in relevant part, "No covered entity [7] shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Section 4112.02 of the Ohio Revised Code reads, in relevant part,

> It shall be an unlawful discriminatory practice [f]or any employer, because of the ... disability ... of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

Because the essential elements of a claim under Ohio law and the ADA are the same, the Court will examine the Plaintiff's state and federal claims together. *See Hoffman v. Fidelity Brokerage Servs., Inc.*, 959 F.Supp. 452, 457 n. 1 (S.D.Ohio 1997) (concluding that case law pertaining to claims brought pursuant to the ADA applies equally to claims brought under the Ohio discrimination statute); *Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St.3d

---

7. A "covered entity" includes an employer with 15 · or more employees. 42 U.S.C. §§ 12111(1) and (5)(A). BKW has stipulated that it had 15 employees during the time that Plaintiff was employed.

569, 697 N.E.2d 204, 206–07 (1998) (stating that Ohio courts may look to federal ADA regulations and cases for guidance in interpreting the Ohio statute).

 To establish a prima facie case of disability discrimination, the plaintiff must demonstrate (1) that he is disabled; (2) that he is otherwise qualified for the job, with or without reasonable accommodation; (3) that he suffered an adverse employment decision; (4) that the employer knew or had reason to know of his disability; and (5) that, after his termination, the position remained open, or the disabled employee was replaced. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1185 (6th Cir.1996) (citations omitted). If the plaintiff succeeds in establishing a prima facie case, then the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Monette*, 90 F.3d at 1185; *Hood v. Diamond Prods., Inc.*, 74 Ohio St.3d 298, 658 N.E.2d 738, 741 (1996). If the employer succeeds in doing so, then the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason is a pretext for unlawful discrimination. *Monette*, 90 F.3d at 1185–86; *Hood*, 658 N.E.2d at 742.

Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Tex. Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). In some cases, a plaintiff's evidence establishing the prima facie case can also be sufficient to meet one or more of the elements necessary to rebut the defendant's proffered non-discriminatory reasons. *See id.* at 149, 120 S.Ct. 2097. While it is permissible for a trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation, proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination. *Id.* at 147, 120 S.Ct. 2097. Furthermore, the mere rejection of the employer's proffered justification does not compel judgment for the plaintiff. *Id.* at 146–47, 120 S.Ct. 2097 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 511, 519, 524, 113 S.Ct. 2742).

Defendant argues that Plaintiff's disability discrimination claims cannot survive for three principal reasons: (1) Plaintiff has not established that he has a disability recognized by the ADA; (2) Defendant did not have actual or constructive notice of any disability; and (3) Defendant fired Plaintiff for a legitimate, non-discriminatory reason.

### 1. Disability

The ADA defines the term "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Plaintiff's claim falls under the first of these definitions. The parties do not dispute that Plaintiff suffers from a physical impairment. The essential question is whether Plaintiff's physical impairment substantially limits one of his major life activities.

 The determination of whether an impairment substantially limits a person's major life activities is an individualized inquiry. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198–99, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483,

119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). No impairment constitutes a disability per se; rather, an impairment is a disability if it limits the major life activities of the particular individual who is impaired. *Sutton*, 527 U.S. at 483, 119 S.Ct. 2139. Further, in determining whether a person is substantially limited in major life activities, the court must consider any corrective measures the plaintiff takes to ameliorate his condition. *See id.* at 482, 119 S.Ct. 2139 (noting that both the positive and the negative effects of any corrective measures must be considered). To qualify as a disability under the ADA, an impairment must "limit an individual, not in a trivial or even moderate manner, but in a major way." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 627 n. 12 (6th Cir.2000). Therefore, "impairments which merely *affect* major life activities" must be distinguished "from those that *substantially limit* those activities." *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998) (emphasis in original).

Although the ADA does not define "major life activities," the EEOC has promulgated regulations that interpret the term as including "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). The term "substantially limits" means inability to perform, or a severe restriction on the ability to perform, as compared to the average person in the general population. 29 C.F.R. § 1630.2(j)(1). In considering whether an individual is substantially limited in a major life activity, the Court should consider "(i) [t]he nature and severity of the impairment; (ii)[t]he duration or expected duration of the impairment; and (iii)[t]he permanent or long term impact, or the expected permanent or long term impact of

or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

Defendant contends that Plaintiff is not disabled because he has a treatable disease that occasionally causes him to be unable to work but that generally does not substantially limit him. Though Hebert claims that Plaintiff was substantially disabled by LPHS, Plaintiff was cleared to work on November 20, 2000, without any restrictions. Furthermore, Defendant asserts, based on Hebert's letter to Miser, Plaintiff's medical condition could be eliminated altogether if Plaintiff lost weight. Plaintiff contends that the Hebert letter does not state that Plaintiff's underlying condition is obesity or that his condition is temporary, and Defendant has no medical evidence to establish otherwise. Plaintiff points to Hebert's Affidavit, where Hebert directly expresses his medical judgment that Plaintiff's LPHS renders him substantially disabled from standing or walking, and emphasizes that there is no competent medical testimony to the contrary. Plaintiff notes that walking is recognized as a "major life activity" within the scope of the ADA and that the negative impact of his medications may be considered in determining whether he is disabled. Defendant attempts to counter Plaintiff's arguments by providing an expert report of Dr. William P. Gianakopoulos that states that LPHS is not a medically recognized condition and is not disabling.

 The parties do not dispute that Plaintiff has exhibited certain symptoms, such as dyspnea on exertion, lower extremity edema,[8] low back pain, flank pain, kidney stones, and hematuria. Because the determination of whether a person is disabled is an individualized inquiry, *Toyota*, 534 U.S. at 198–99, 122 S.Ct. 681, several of the arguments raised by both par-

---

**8.** "Lower extremity edema" apparently refers to Brown's swollen feet.

ties are irrelevant. For example, whether LPHS is a medically recognized condition is immaterial to the Court's determination, as is any evidence about whether LPHS is disabling for others with that diagnosis. *See, e.g., Moore v. J.B. Hunt Transport, Inc.,* 221 F.3d 944, 952 (7th Cir.2000) ("General statements concerning rheumatoid arthritis, and the possibility that [plaintiff] might experience various debilitating aspects of the condition, do not establish that [plaintiff's] arthritis rises to the level of a disability."). As the Supreme Court has recently stated,

> It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those "claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial."

*Toyota* at 198–99, 122 S.Ct. 681 (quoting *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999)) (alterations in original) (noting that "[a]n individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person"). Gianakopoulos's statement that LPHS is not disabling because "if this were a distinct entity as a disease model the progression would be one of benign disease with no tissue damage" is thus accorded minimal weight by this Court. Plaintiff's assertion that a percentage of the population of LPHS sufferers progresses to end stage renal failure is likewise of little evidentiary value.

■ Plaintiff is correct that walking is explicitly recognized as a major life activity. 29 C.F.R. § 1630.2(i). The Court still must determine, however, whether, considering the three factors noted above, Brown is substantially limited in his ability to walk, as compared with a member of the general population. *See* 29 C.F.R. § 1630.2(j). For the following reasons, the Court concludes that Brown is not substantially limited in the major life activity of walking, so he has not established the first prong of his prima facie case-that he is disabled for purposes of the ADA.[9]

The only evidence that Plaintiff is substantially limited in his ability to walk is (1) undisputed evidence that for approximately three weeks in November 2000, he was unable to walk due to his swollen feet; (2) the statement of Hebert, who treated Plaintiff for LPHS from July 26, 2000, to November 17, 2000, that, "[w]ith respect specifically to Mr. Brown, the loin pain hematuria syndrome caused him, in my judgment, to be substantially disabled from standing or walking"; and (3) Brown's testimony that he requested a transfer to the dispatcher position in February 2000 because of severe back pain and swelling in his feet that made standing and walking difficult.

As a threshold matter, the Court notes that mere difficulty in standing or walking is not sufficient to establish a substantial limitation on the major life activity of walking. *See* 29 C.F.R. § 1630.2(j)(2)(i). Other courts have held that a plaintiff who has only moderate difficulty in walking may not establish a substantial impairment for summary judgment purposes. *E.g., Satterly v. Borden Chem., Inc.,* 24 Fed. Appx.471, 472 (6th Cir.2001) (finding that although plaintiff had difficulty walking

9. Plaintiff does not contend that he is disabled with respect to any major life activity other than walking.

and may walk at a slower pace than others, he had failed to establish substantial impairment); *Talk v. Delta Airlines, Inc.,* 165 F.3d 1021, 1025 (5th Cir.1999) (finding that plaintiff's difficulty with walking as a result of a deformed leg did not rise to the level of a substantial impairment under the ADA); *Penny v. United Parcel Serv.,* 128 F.3d 408, 415 (6th Cir.1997) (finding that "moderate difficulty or pain experienced while walking does not rise to the level of a disability" under the ADA); *Kelly v. Drexel Univ.,* 94 F.3d 102, 106, 108 (3d Cir. 1996) (finding no substantial limitation in ability to walk where plaintiff suffering from severe post-traumatic degenerative joint disease of the right hip stated that he could not walk more than a mile or so, could not jog, and had to pace himself slowly when climbing stairs); *Nedder v. Rivier Coll.,* 944 F.Supp. 111, 113–17 (D.N.H.1996) (finding at most moderate impairment where plaintiff could walk, albeit with considerable exertion and more slowly than the average person due to her obesity).

Based on the evidence before the Court, the only time Plaintiff's ability to walk was substantially limited by his LPHS was during the three weeks in November 2000 when he was completely unable to walk. At oral argument, Plaintiff asserted that his LPHS is a continuous condition characterized by episodic flare-ups during which he is substantially disabled from walking. Plaintiff has not established that his ability to walk was more than moderately impaired at any time other than during the pendency of these flare-ups. In fact, approximately one week after his termination in January 2001, Plaintiff went to work for a building supply company doing substantially the same work he initially performed for Defendant before being transferred to a position that required less standing and walking. *See Plant v. Morton Int'l, Inc.,* 212 F.3d 929, 937 (6th Cir.2000) (noting that the plaintiff was unlikely to be disabled because he worked sporadically after his termination); *Johnson v. City of Mason,* 101 F.Supp.2d 566, 574 (S.D.Ohio 2000) (finding no showing that plaintiff suffered more than a limited or temporary impairment in walking where he started a new job, with similar duties as with his former employer, one week after resigning his employment with defendant). Between his discharge from BKW and the present, Brown has continued to work in similar jobs that require walking.

■■■ Typically, "short-term, temporary restrictions are not substantially limiting." *Roush v. Weastec, Inc.,* 96 F.3d 840, 843 (6th Cir.1996) (citing *Hamm v. Runyon,* 51 F.3d 721, 725 (7th Cir.1995)); *see Toyota,* 534 U.S. at 198, 122 S.Ct. 681 (stating that "[t]he impairment's impact must also be permanent or long term") (citing 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii)); *see also Fagan v. United Int'l Ins. Co.,* 128 F.Supp.2d 182, 185 (S.D.N.Y.2001) (stating that a "transitory impairment is not considered substantially limiting") (citation omitted). Likewise, "[i]ntermittent, episodic impairments" generally are not considered to be disabilities. *Johnson,* 101 F.Supp.2d at 574 (quoting *Vande Zande v. Wis. Dep't of Admin.,* 44 F.3d 538, 544 (7th Cir.1995)); *see also EEOC v. Sara Lee Corp.,* 237 F.3d 349, 352 (4th Cir.2001) (holding that epileptic's seizures did not substantially limit a major life activity and stating, "[t]o hold that a person is disabled whenever that individual suffers from an occasional manifestation of an illness would expand the contours of the ADA beyond all bounds").

Episodic, impairing manifestations or flare-ups caused by an underlying chronic condition may constitute a disability if they occur with sufficient frequency and are of sufficient duration and severity to substan-

tially limit a major life activity. *Carruth v. Cont'l Gen. Tire, Inc.*, No. 98–CV–4233–JPG, 2001 WL 1775992, at *6–9 (S.D.Ill. June 21, 2001) (holding that plaintiff's inability to work, due to flare-ups of his diabetes, for 21 days in a six month period was sufficient to support a finding that plaintiff was substantially limited in the major life activity of working); *cf. Moore*, 221 F.3d at 948, 952 (holding that plaintiff's one or two flare-ups a year, lasting one to two days apiece, were insufficient to render his condition a disability); *Wilborn v. Ashcroft*, 222 F.Supp.2d 1192, 1207–08 (S.D.Cal.2002) (holding that plaintiff's symptoms were too intermittent and episodic to constitute a disability under Rehabilitation Act, where plaintiff's back would "go out" no more than twice a year, with each episode lasting from a few days to a week), *aff'd*, 70 Fed.Appx. 469, 2003 WL 21751819 (9th Cir.2003).

Here, there is no evidence that Plaintiff ever experienced more than *one* flare-up of his LPHS—an episode lasting approximately two and a half weeks in November 2000 in which he was unable to walk. Neither one "episodic" manifestation nor an impairment of two and a half weeks can suffice to support a finding of disability under the ADA.[10] Plaintiff simply has not presented sufficient evidence that the substantial impairment of his ability to walk was anything other than temporary. *See Ogborn v. United Food & Commercial Workers Union, Local No. 881*, 305 F.3d 763, 767–68 (7th Cir.2002) (holding that, because plaintiff had not identified any

evidence that depression limited his ability to work either before or after one eight week episode, he had not established that his impairment was not temporary); *Plant*, 212 F.3d at 938 (holding that, despite the fact that the evidence did not clearly indicate that his condition was temporary, plaintiff could not defeat a motion for summary judgment because he "was unable to come forward with any evidence that [his condition] was permanent, and the mere possibility of recurrence is not sufficient to establish substantial impairment"); *Roush*, 96 F.3d at 844 ("We do not doubt that the plaintiff suffered from a kidney condition and had a physical impairment.... However, there is no evidence that this impairment presently substantially limits a major life activity within the meaning of the ADA.... Because plaintiff's kidney condition was temporary, it is not substantially limiting...."). Furthermore, the two and a half week duration of Plaintiff's impairment clearly denotes an impairment that is temporary rather than long-term. *See, e.g., Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 646 (2d Cir.1998) ("[A] seven-month impairment of [plaintiff's] ability to work ... is of too short a duration and too vague an extent to be 'substantially limiting.' "); *Sanders v. Arneson Prods., Inc.*, 91 F.3d 1351, 1354 (9th Cir.1996) (impairment lasting less than four months was not substantially limiting); *McDonald v. Pa., Dep't of Public Welfare, Polk Ctr.*, 62 F.3d 92, 96 (3d Cir.1995) (holding plaintiff's incapaci-

---

**10.** The fact that his return to work slip put no restrictions on his work activities also supports the conclusion that Brown was not disabled. *See, e.g., Satterly*, 24 Fed.Appx. at 472 (finding plaintiff failed to establish substantial impairment where neither of his treating physicians imposed any restrictions on his work); *Fagan*, 128 F.Supp.2d at 185 (finding relevant the fact that a doctor's note given to plaintiff's employer upon his return to work put no

restrictions on his work activities); *Kalekiristos v. CTF Hotel Mgmt. Corp.*, 958 F.Supp. 641, 656–57 (D.D.C.) (finding persuasive the fact that none of the physicians who treated plaintiff during the discrimination period placed him on restricted duty status or restricted any of his major life activities), *aff'd*, 132 F.3d 1481 (table), 1997 WL 812530 (D.C.Cir.1997).

tation for less than two months insufficient to constitute a disability under ADA).

Hebert's Affidavit does not suffice to salvage Plaintiff's ADA claim. There is no indication that Hebert's opinion that Plaintiff was "substantially disabled from standing or walking" refers to anything more than Plaintiff's inability to walk for approximately two and a half weeks in November 2000. Not only is the statement in the past tense, but Hebert only treated Plaintiff from July 2000 to November 2000. Hebert's Affidavit does not indicate that even Hebert believes that Plaintiff's impairment was permanent or long-term. Indeed, Hebert's statement that Plaintiff was "substantially disabled" is nothing more than a conclusion that fails to state the basis for the conclusion or to point to any specific facts that show that there is a genuine issue for trial. *See Moore*, 221 F.3d at 952 (holding that doctor's statement that plaintiff's impairment is substantially limiting did not defeat summary judgment because it did not provide specific facts but was "merely conclusory, restating the requirements of the law") (citing *Doren v. Battle Creek Health Sys.*, 187 F.3d 595, 598–99 (6th Cir.1999)).

The Court's finding that Plaintiff was not disabled for purposes of the ADA is sufficient, without more, to warrant the granting of Defendant's Motion for Summary Judgment. Plaintiff's claims under the ADA and Chapter 4112 also fail, however, due to Plaintiff's failure to provide his employer with notice of a disability.

### 2. Notice of Disability

■ Defendant contends that Plaintiff did not provide it with reasonable notice of a disability. According to Defendant, neither providing the office manager and bookkeeper with a copy of an article on his alleged disability nor speaking with Coppens regarding his swelling feet is sufficient to support a finding that Brown gave BKW notice of his disability. Defendant further argues that neither the fact that Plaintiff had been off work nor the fact that Coppens and Hein were aware that Plaintiff had been off work for medical reasons establishes that BKW had notice of Plaintiff's disability.

Plaintiff contends that the deposition testimony of both Coppens and Hein establishes that BKW was aware of his disability. Plaintiff also asserts that his testimony that he was reassigned to the dispatcher job because of his disability and that Coppens talked to him about going on disability must be taken as true for purposes of this Motion and is sufficient to establish that BKW either knew or should have known of his disability. As additional support for his claim that BKW had notice of his disability, Plaintiff points to the fact that he spoke with Esther Kessler about his disability and gave her an article on LPHS, and that even Parker knew about Brown's medical problems.[11]

■ As part of his prima facie case, a person alleging a disability protected by the ADA must establish that his employer had either actual or constructive notice of the disability. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1185 (6th Cir.1996). An employer has notice of the employee's disability when the employee tells the employer that he is disabled.[12] *See Hammon*

---

11. Plaintiff presents the following testimony from Parker as evidence that he was aware of Plaintiff's disability: "Q. Did you ever discuss with Joe or with Scott or anyone else at the company about John being out for medical reasons? A. Not per se, other than to say it looks like he's off for a month with whatever he's got now."

12. There is some authority for the idea that the employee is actually required to provide the employer with medical documentation.

*v. DHL Airways,* 165 F.3d 441, 449–50 (6th Cir.1999); *Gantt v. Wilson Sporting Goods Co.,* 143 F.3d 1042, 1046 (6th Cir. 1998). "The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." *Hammon,* 165 F.3d at 449–50 (quoting *Gantt,* 143 F.3d at 1046–47).

This case is analogous to *Hammon,* where the plaintiff informed his employer of his immediate problem (there, a loss of confidence; here, swollen feet) without informing the employer that the problem was traceable to a disability. *Hammon,* 165 F.3d at 450 (finding no actual or constructive notice where plaintiff, a pilot, had informed his supervisors about his loss of confidence but had never suggested that his emotional problems stemmed from a condition of disability). As demonstrated above, many medical conditions do not qualify as disabilities for purposes of the ADA. Often, the only way an employer can know whether an employee's health problems constitute a disability is if the employee provides it with some form of medical documentation. Here, it is undisputed that Plaintiff never provided BKW with any documentation of a disability. The only potential medical documentation, Plaintiff's return to work slips, all indicated that Plaintiff could return to work without restriction; they therefore could have given BKW no notice of a disability. To construe an employer as having notice of an employee's disability every time an employee is absent from work for a medical reason would defy common sense.

At best, the evidence as to Coppens, Hein, and Parker establishes that they knew Brown had health problems. Knowing that an employee has health problems, however, is not the same as knowing that the employee suffers from a disability. *See Hammon,* 165 F.3d at 450. While Kessler arguably had notice that Brown had a disability, she is not a supervisor, manager, or human resources officer. Merely informing a co-worker about a disability is not sufficient to give an employer notice of that disability.[13] Plaintiff's testimony that he was transferred to the dispatcher position because of his disability also arguably supports his claim of notice. Plaintiff's position is that he informed Korpieski of his disability. Since Korpieski was a manager, his knowledge should be imputed to BKW. There is apparently no documentation of any such knowledge, however, and there is no evidence that the managers at the time of Brown's termination, Coppens and Hein, had any knowledge of Plaintiff's alleged disability. More importantly, Brown's actual testimony is that Korpieski knew Brown had health problems. As discussed above, such knowledge does not necessarily constitute notice of a disability. Even Coppens's comment that Brown

*See Kalekiristos v. CTF Hotel Mgmt. Corp.,* 958 F.Supp. 641, 657 (D.D.C.) ("A person alleging a disability protected by the ADA has a burden of establishing with medical evidence the existence of the alleged disability, and presenting the documentation during the term of employment, not following termination."), *aff'd,* 132 F.3d 1481 (table), 1997 WL 812530 (D.C.Cir.1997); *Farley v. Gibson Container Inc.,* 891 F.Supp. 322, 326 (N.D.Miss.1995) ("Employers should not be expected to recognize a physical impairment solely on an employee's 'say-so'. . . . The logical consequences

of such blind acceptance are simply too obvious to state.").

**13.** Additionally, Plaintiff providing Kessler with an article on LPHS does not necessarily suffice as documentation that he suffers from LPHS. Also, as noted above, even if Defendant was on notice that Plaintiff was diagnosed with LPHS, due to the nature of that syndrome, the diagnosis alone would not necessarily be sufficient to give Defendant actual notice that Plaintiff was substantially impaired.

should quit and draw long-term disability benefits does not evince anything more than a general knowledge that Brown had health problems: it does not prove that Coppens was aware of Brown's LPHS-induced disability.

Based on Plaintiff's failure to establish both that he had a legally cognizable disability and that he provided Defendant with notice of that disability, the Court **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's ADA and Chapter 4112 claims.

### C. Plaintiff's Other Claims

In his Memorandum Contra Defendant's Motion for Summary Judgment, Plaintiff stipulates to the dismissal of his FMLA claim based on having discovered that BKW does not have 50 or more employees as required by 29 U.S.C. § 2611(4). Plaintiff also stipulates to the dismissal his claim under Ohio public policy based on the Ohio Supreme Court's decision in *Wiles v. Medina Auto Parts*, 96 Ohio St.3d 240, 773 N.E.2d 526 (2002). The Court therefore **DISMISSES** these claims with prejudice.

### V. CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff John Brown's Motion to Strike the Affidavit of Brad Ballantine and **GRANTS** Defendant's Motion for Summary Judgment.

**IT IS SO ORDERED.**